**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

TIMOTHY ALLEN DAVIS, SR,

    Plaintiff,

v.              Case No:  6:15-cv-1631-Orl-37KRS

CITY OF APOPKA; ROBERT MANLEY,
III; RANDALL FERNANDEZ; NICOLE
DUNN; ANDREW PARKINSON;
RUBEN TORRES; MATTHEW
REINDHART; MARK CREASER; and
RAFAEL BAEZ,

    Defendant.

_____

## ORDER

This matter is before the Court on the following:

1.   Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint and Supporting Memorandum of Law (Doc. 127), filed March 25, 2016;

2.   Defendant City of Apopka's Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. 128), filed March 28, 2016;

3.   Plaintiff's Response in Opposition to Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. 129), filed April 8, 2016; and

4.   Plaintiff's Response in Opposition to Defendant City of Apopka's Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. 130), filed April 11, 2016.

## BACKGROUND

Timothy Davis, Sr. ("**Plaintiff**") is a father of African-American heritage who—after retiring as a Lieutenant after nineteen years of service with the Orlando Police

Department—currently owns and operates several child day-care facilities. (*See* Doc. 122, ¶¶ 10, 20.) Starting in October 2011, Plaintiff also was the defendant in *State of Florida v. Timothy Davis*, No. 2011-CF-3424-A-O ("**Criminal Case**"), which concerned the killing of Plaintiff's adult son Timothy Allen Davis, II ("**Timmy**"). (*See id.* ¶¶ 2, 162.) In February 2013, the Criminal Case concluded when Plaintiff was acquitted of second degree murder by a jury in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida ("**Criminal Verdict**"). (*Id.* ¶¶ 3, 152; *see also id.* at p. 122.)

Alleging that his state and federal rights were violated during the investigation and prosecution of the Criminal Case, in his Third Amended Complaint ("**Complaint**"), Plaintiff asserts civil rights claims against the City of Apopka ("**City**") and eight Apopka Police Department ("**APD**") employees ("**Individual Defendants**")—Chief of Police Robert Manley, III ("**Chief Manley**"), Captain Randall Fernandez ("**Captain Fernandez**"), Detectives Andrew Parkinson ("**Detective Parkinson**"), Ruben Torres ("**Detective Torres**") and Matthew Reinhardt ("**Detective Reinhardt**"), Officers Mark Creaser ("**Officer Creaser**") and Rafael Baez ("**Officer Baez**"), and Crime Scene Technician Nicole Dunn ("**CST Dunn**"). (*See id.*) All of the Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Doc. 127 ("**Joint MTD**"); Doc. 128 ("**City MTD**").) Plaintiff responded (Docs. 129, 130), and the matter is ripe for adjudication.

## THE COMPLAINT

### I.    The Altercations

In the Fall of October 2011, Plaintiff resided in a home ("**Home**") with his family—his wife Tarsha Davis (**"Mrs. Davis"**), a nine year-old daughter ("**Minor Daughter**"), a

ten year-old son ("**Minor Son**"), and Timmy. (*Id.* ¶¶ 21, 22.) Timmy had recently returned to the Home after leaving college, where he had played football. (*Id.*) Timmy had weighed approximately 280-pounds, stood 6'1" tall, and was the father of a young child ("**Child**"). (*Id.*)

At the conclusion of a multi-day visit between Timmy and the Child, the Child's mother ("**Mother**") arrived at the Home to retrieve the Child on October 1, 2011. (*Id.* ¶¶ 22, 23.) Timmy refused to surrender the Child to the Mother, a dispute ensued, and Plaintiff attempted to reason with Timmy. (*Id.* ¶¶ 24, 25.) While Timmy argued with Plaintiff, Mrs. Davis placed the Child in the Mother's car. (*Id.* ¶¶ 26–27.) This action allegedly incensed Timmy, who "charged after Mrs. Davis, yelling and cursing her." (*Id.*) To prevent physical harm to Mrs. Davis and the Mother, Plaintiff intervened, and Timmy "walked off down the street" after he threatened to "beat" Plaintiff ("**Initial Altercation**"). (*See id.*)

Approximately 15 minutes after the Initial Altercation, Timmy returned to the Home and was advised by Plaintiff and Mrs. Davis that he had to "move out" of the Home. (*Id.* ¶ 29.) Timmy responded by going upstairs "angrily" and breaking down in tears. (*Id.*) Plaintiff—who was on his way to join his Minor Daughter outside the Home—instead went upstairs to "calm Timmy down." (*Id.* ¶ 30.) Timmy was not calmed; rather, he yelled at Plaintiff and "brutally attacked" him by **"**head-butt[ing]," "football-tackl[ing]," and "slamming" Plaintiff to the tile floor in the upstairs bathroom. (*Id.* ¶ 31.) Timmy then straddled a "completely defenseless" Plaintiff, and repeatedly punched him in the face until Plaintiff bled. (*Id.* ¶ 32.) During this attack, Plaintiff's head struck the toilet, he landed on the back of his head, his "eyeglasses" were broken and tossed from his face, and his knees were severely injured ("**Second Altercation**"). (*Id.* ¶¶ 31–32.)

Mrs. Davis heard the Second Altercation, ran upstairs, attempted to pull—then eventually coaxed—Timmy off of Plaintiff, and finally assisted Plaintiff off of the bathroom floor. (*Id.* ¶¶ 33–34.) Visibly bruised and swollen around his eyes, jaw, and lips, Plaintiff instructed Mrs. Davis to "call the paramedics for his severely injured knees" and face. (*Id.* ¶¶ 35, 36, 49.) Attempting to distance himself from Timmy and "avoid continued violence," Plaintiff then stumbled downstairs to sit and "wait for the paramedics." (*Id.*) Timmy allegedly followed Plaintiff downstairs and then into the garage, so Plaintiff then "limped out of the garage to the driveway where his car was parked ("**Plaintiff's Retreat**"). (*Id.* ¶¶ 36–38.)

Hoping that the mere sight of a firearm "would scare [Timmy] from attacking him again"—Plaintiff retrieved a firearm from his car. (*Id.* ¶ 39.) From less than ten yards away, Plaintiff observed Timmy pace back and forth inside the garage, remove his sweatshirt, throw it to the ground in a "fighting gesture", and then walk "aggressively" toward Plaintiff. (*Id.* ¶ 40.) Panicked, Plaintiff fired a shot in Timmy's direction to "scare him off," but "Timmy continued to advance toward" him. (*Id.* ¶ 41.) In "self-defense," Plaintiff fired again, and the second shot struck Timmy in the chest. (*Id.* ¶ 42.) Plaintiff saw "blood coming from Timmy's upper chest area" ("**Shooting**"). (*Id.*)

Plaintiff called to Mrs. Davis for help and attempted to escort Timmy to Plaintiff's car for transport to the hospital; however, when they neared the car, "Timmy collapsed to the ground." (*Id.* ¶¶ 43, 44, 48, & 53.) Timmy's collapse caused Plaintiff's injured knees to buckle, and Plaintiff "lost his balance," fell on top of Timmy, and was then "unable to move because of his injured knees." (*Id.*) Mrs. Davis then called 911 to report that Plaintiff "had a confrontation with" Timmy and "she believed" Plaintiff had "shot." (*Id.* ¶¶ 45, 46.)

Some of Plaintiff's neighbors—who came to the Home in response to the loud noises—allegedly witnessed Plaintiff's position on top of Timmy and the "visible injuries" to Plaintiff's face ("**Aftermath**"). (*Id.*)

## II.   Police Response

A few minutes "after Mrs. Davis's 911 call," Officers Creaser and Baez arrived at the Home followed a few minutes later by Chief Manley. (*See id.* ¶¶ 12, 18, 19, 47.) Upon inquiry by Officer Creaser, Plaintiff—who was still immobilized on top of Timmy—advised that he shot Timmy "because [he] beat me up and kept coming at me" and the gun was in front pocket of Plaintiff's pants. (*See id.* ¶¶ 51, 54, & 55.) Officer Creaser then "handcuffed Plaintiff and recovered the gun." (*See id.* ¶¶ 56, 93, 95, & 96.)

At the direction of Chief Manley: (a) Officers Creaser and Baez lifted Plaintiff up and took him to the garage; and (b) Timmy, Mrs. Davis, and the Minor Daughter were transported to the Orlando Regional Medical Center ("**ORMC**"), where Timmy died at 12:36 a.m. on October 2, 2011. (*See id.* ¶¶ 64, 114.) Chief Manley directed that Plaintiff be transported to a different hospital ("**FHA**"), where Plaintiff remained handcuffed, "under guard," and—for almost two hours—ignorant of the fact that Timmy was deceased. (*Id.* ¶¶ 58–60, 62, 63, 87, 107, 141.)

While Plaintiff and Timmy were hospitalized, and Mrs. Davis and Underage Daughter were at ORMC, the Individual Defendants allegedly: (1) conducted a warrantless and illegal search of the Home and selectively seized evidence ("**Warrantless Search**") (*see id.* ¶¶ 67, 73–80); (2) edited videotape evidence in an attempt to conceal the warrantless search of Plaintiff's Home ("**Edited Search Tape**")

(*see id.* ¶¶ 76–78); and (3) obtained a search warrant for Plaintiff's Home based on Detective Reindhart's false statements ("**False Warrant**") (*see id.* ¶¶ 82–85).

After Timmy's death, Officer Creaser falsely advised Plaintiff that he was "under arrest" at FHA for "*Attempted* First Degree Murder"[1] ("**False Charge Statement**"). (*See id.* ¶¶ 91–93, 95–97, 100.) Without providing Plaintiff with *Miranda* warnings or advising him that Timmy was dead, Detective Parkinson interrogated Plaintiff at FHA, and learned the circumstances that explained Timmy's violence and established that the Shooting was justified ("**Parkinson Interrogation**"). (*See id.* ¶¶ 98, 108–26, 129–30; *see also id.* ¶ 15.) Nonetheless, Detective Parkinson urged Plaintiff—with the impossible promise of visiting Timmy—to record a statement that improperly cast Plaintiff as Timmy's murderer and omitted the inculpatory facts and circumstances ("**Recorded Statement**"). (*See id.*) The Individual Defendants then erased portions of the Recorded Statement that revealed the Individual Defendants' improper manipulation of Plaintiff. (*See id.* ¶ 127);

By October 7, 2011, after Plaintiff's knee surgery and hospitalization, the Individual Defendants allegedly knew that Plaintiff had acted in self-defense and no reasonable officer could have concluded that probable cause existed to charge Plaintiff for the murder of Timmy. (*See id.* ¶¶140–42, 147–49, 152.) Nonetheless, when Plaintiff was discharged from the hospital, the Individual Defendants had Plaintiff transported to the Orange County Jail ("**Jail Transport**") and kept him confined there until October 21, 2011 ("**Initial Confinement**"). Plaintiff further alleges that Chief Manley did not allow Plaintiff to attend Timmy's funeral on October 8, 2011, he delayed Plaintiff's release on bond, and he

---

[1] Plaintiff alleges that his arrest affidavit indicated that he was "arrested for First Degree Murder" when he was still at his Home, before any witnesses were interviewed, and while Timmy was still alive. (*See* Doc. 122, ¶¶ 91–93, 95–97, 100; *see also id.* ¶ 132.)

unjustifiably had Plaintiff detained to the Home until February 2013, when the Criminal

Verdict was returned. (*Id.*).

### III.    Retaliation

After the Criminal Verdict, Plaintiff alleges that he suffered retaliation when

unspecified Defendants: (1) "maliciously ignored" requests for law enforcement services

after Plaintiff and his family received death threats (*id.* ¶ 160); (2) without probable cause,

arrested an employee of Plaintiff's child-care facility ("**Employee**") for committing

"aggravated child abuse" (*id.* ¶¶ 157–58); and (3) coordinated with a local news station to

defame and "unfairly discredit" Plaintiff's child care business based on the Employee's

unlawful arrest (*id.* ¶ 159).

### IV.    The Plan

Plaintiff alleges that his arrest and the unsuccessful Criminal Case happened in

accordance with a plan—which was devised in the front yard of the Home on the day of

the Shooting (the "**Plan**")—to improperly charge and prosecute Plaintiff for Timmy's

murder even though any reasonable officer responding to the Shooting would have

concluded that Plaintiff was an innocent victim of domestic violence who lawfully shot

Timmy in self-defense. (*See id.* ¶¶ 13, 14, 16, 17, 68.) According to Plaintiff, the Plan

originated from Chief Manley's "deep-rooted animus" against Plaintiff, and it was carried

out by the Individual Defendants who refused to conduct "a Stand Your Ground

investigation" and deliberately ignored APD's established domestic violence investigation

protocol and procedures by:

> (1)    declining "to classify [Plaintiff] as a victim of domestic violence" even
> though Officers Creaser and Baez could see that Plaintiff had
> suffered severe physical injuries as a result of Timmy's relentless
> violent attack in the Home (*id.* ¶¶ 21–22, 68–71, 86, 99, 102);

(2)     refusing to photograph Plaintiff so that his injuries would not be documented (*id.* ¶¶ 69–70, 99, 105, 106);

(3)     conducting the Warrantless Search, editing the Search Tape, and obtaining the False Warrant (*id.* ¶¶ 67, 73–80, 82–85);

(4)     arresting Plaintiff before interviewing available witnesses, such as Timmy (before his death), Mrs. Davis, Minor Daughter, and Plaintiff's neighbors (*see id.* ¶¶ 99–104; *see also id.* ¶¶ 133, 134, 137, 140);

(5)     failing to advise Plaintiff of his *Miranda* rights "upon his arrest" or before conducting improper custodial interrogations of Plaintiff (*id.* ¶¶ 98, 118, 122–24); and

(6)     obtaining the Recorded Statement by manipulating Plaintiff with the False Charge Statement and during the Parkinson Interrogation, and then improperly editing the Recorded Statement (*id.* ¶¶ 108–27).

Plaintiff further alleges that the Individual Defendants continued with the Plan during the Criminal Case, when they: (7) tampered with evidence; (8) omitted inculpatory information; (9) provided false deposition and trial testimony; (10) refused to fulfill the crime lab's request for a sample of Plaintiff's blood; and (11) failed to advise Plaintiff's attorney of the crime lab's request for Plaintiff's blood or its analysis of blood splatter evidence found in the bathroom of the Home. (*See id.* ¶¶ 74, 77–80, 124, 128, 131, 132, 135, 137–39, 150–53; *see also id.* at ¶ 136 (alleging that the audio-tape and transcription of an interview of Minor Daughter was altered).)

## V.    Plaintiff's Claims

Asserting forty-four state and federal claims against Defendants and the City (collectively, "**Defendants**"), Plaintiff seeks to recover compensatory damages for: (1) violations of his Constitutional rights; (2) lost income; (3) unnecessarily incurred legal costs related to the Criminal Case; (4) injuries to his personal and business reputation; and (5) the severe emotional distress he experienced during his confinement—

particularly when he was prevented from attending Timmy's funeral services. (*Id.* ¶¶ 145–46, 153–156.) Specifically, on pages thirty-one through sixty-five of the Complaint, Plaintiff asserts § 1983 claims for violations of his Fourth and Fourteenth Amendment rights based on:

    (1)    "false arrest and unreasonable seizure" of Plaintiff by each of the nine Defendants—the City (*id.* ¶¶ 169–77 (**Count I**)), Chief Manley (*id.* ¶¶ 188–96 (**Count III**)), Captain Fernandez (*id.* ¶¶ 197–209 (**Count IV**)), CST Dunn (*id.* ¶¶ 210–21 (**Count V**)), Detective Parkinson (*id.* ¶¶ 222–31 (**Count VI**)), Detective Torres (*id.* ¶¶ 232–40 (**Count VII**)), Detective Reinhart [sic] (*id.* ¶¶ 241–49 (**Count VIII**)), Officer Baez (*id.* ¶¶ 250–62 (**Count IX**)), and Officer Creaser (*id.* ¶¶ 263–75 (**Count X**)); and

    (2)    "unreasonable search" of Plaintiff's Home by the City (*id.* ¶¶ 178–87 (**Count II**)), and by every Individual Defendant except Officer Creaser (*see id.* ¶¶ 276–353 (**Count XI—XVII**).

In the remaining fifty-three pages of Plaintiff's 118 page Complaint, Plaintiff asserts three state law claims against each Defendant for: (1) false arrest (*id.* ¶¶ 354–409 (**Counts XVIII–XXV**))[2]; (2) malicious prosecution (*id.* ¶¶ 410–500 (**Counts XXVI–XXXIV**); and (3) intentional infliction of emotional distress ("**IIED**") (*id.* ¶¶ 501–599 (**Counts XXXV–XXXXIII**)).

## PLEADING STANDARDS

In federal court, a viable pleading must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a complaint "fails to state a claim to relief that is plausible on its face," the defendant may seek

---

[2] Plaintiff advises that he intended to designate Count XVIII as a state law claim against the City for false arrest, but that Count was masked from the Complaint during Plaintiff's scanning process. (*See* Doc. 130, p. 19.) The basis of Plaintiff's claim is evident from the allegations contained in the Complaint. (*See.* Doc. 122, p. 64.) As such, the Court will follow the parties lead and construe Count XVIII as a claim against the City for false arrest. (*See e.g.* Doc. 129, p. 3.)

dismissal of the complaint under Rule 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 672, 678–79 (2009). In resolving a pleading challenge, courts consider only the complaint, written instruments attached to the complaint as exhibits, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). Courts also must accept the truth of all well-pled factual allegations—but not legal conclusions. *Tellabs*, 551 U.S. at 323. After disregarding allegations that "are not entitled to the assumption of truth," the courts must determine whether the complaint includes "factual content" sufficient to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

## DISCUSSION

### I.   Shotgun Pleading

Defendants argue that the Court should dismiss all of Plaintiff's forty-four claims because the Complaint is a shotgun pleading that fails to provide them with sufficient notice of Plaintiff's claims or the grounds on which each claim rests. (Doc. 127, pp. 5–8, Doc. 128, pp. 5–6.) Upon careful review, the Court finds that the unnecessarily lengthy Complaint is replete with careless errors and it falls far short of any model of clarity; nonetheless, the Complaint does not run so far afield of minimum pleading requirements that another dismissal of the entire Complaint is required under Rule 12(b)(6). Thus, the Court has done its best to ascertain the basis of Plaintiff's inartfully pled claims and has thoroughly examined the Complaint to determine whether a plausible claim exists.

### II.   Federal Claims

The Fourth Amendment to the U.S. Constitution—which is applicable to state

actors pursuant to the Fourteenth Amendment—secures an individual's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. Those who—under color of law— violate "any rights, privileges, or immunities secured by the Constitution and laws" may be held liable pursuant to § 1983. *See Baker v. McCollan*, 443 U.S. 137, 140 (1979). "To state a claim against under § 1983, a plaintiff must allege facts sufficient to establish that (1) the defendant deprived him of a right secured under the U.S. Constitution or federal law, and (2) such deprivation occurred under color of state law." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010) (citation omitted).

## A.  Individual Defendants

The affirmative defense of qualified immunity often shields government officials from § 1983 liability for individual capacity claims that are based on acts or omissions that occur when the government official acts within his or her discretionary authority. *See Rivas v. Freeman*, 940 F.2d 1491, 1494–95 (11th Cir. 1991). Upon proof that a defendant official was acting within his or her discretionary authority when the alleged misconduct occurred,[3] the court must dismiss plaintiff's § 1983 claim unless the plaintiff establishes: (1) that the defendant violated the Constitution or federal law; and (2) the illegality of the defendant's conduct was clearly established when the violation occurred. *See Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012); *Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). Each of the Individual Defendants contend that they are entitled to

---

[3] It is clear from the face of the Complaint that the Individual Defendants were acting within their discretionary authority because the conduct at issue was undertaken pursuant to "the performance of [their] duties," and "within the scope of [their] authority" as law enforcement officers of the APD. *See Habert Intern., Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir.1998).

qualified immunity concerning Plaintiff's federal civil rights claims against each of them. (*See* Doc. 127.)

### 1.   Unlawful Arrest and Seizure

"An arrest without a warrant and lacking probable cause violates the Constitution and can underpin a § 1983 claim." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). An officer's subjective intent or motivation is irrelevant to the determination of probable cause; rather, courts must make an objective determination whether the "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (citations omitted). Further, only "arguable probable cause" is necessary to establish a qualified immunity defense. *Knight v. Jacobson*, 300 F.3d 1272, 1274 (11th Cir. 2002). Arguable probable cause exists when reasonable officers in the same circumstances and possessing the same knowledge as the defendant "could have believed probable cause existed." *See id*; *see also Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)

To avoid dismissal of each of his § 1983 false arrest claims, Plaintiff must have alleged sufficient facts in the Complaint to permit plausible inferences that each of the Individual Defendants caused the unlawful arrest of Plaintiff. The Individual Defendants argue that the Complaint does not include such factual allegations because arguable probable cause is evident from the face of the Complaint. (Doc. 127, pp. 8–13.) Plaintiff counters that the specific factual allegations in the Complaint so conclusively established that Plaintiff acted in self-defense that plausible inferences must be drawn that no

reasonable police officer with the same knowledge of the facts and circumstances known to the Individual Defendants could find even arguable probable cause that Plaintiff's shooting of Timmy constituted a criminal offense. (Doc. 129, pp. 4–15).

Construing every inference in Plaintiff's favor as the Court must, the Court does not find sufficient specific factual allegations to support Plaintiff's unlawful arrest claims against Captain Fernandez, CST Dunn, or Detectives Parkinson, Torres, or Reinhardt (the "**NA Defendants**"). Plaintiff does not allege that any specific NA Defendant directly or indirectly caused Plaintiff's unlawful arrest; rather, the factual allegations against the NA Defendants  are  that their respective actions were taken during  the post-arrest investigation and prosecution of Plaintiff. Accordingly, the Court finds that qualified immunity bars Plaintiff's unlawful arrest claims against the NA Defendants. *See Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 737 (11th Cir. 2010) (affirming the grant of qualified immunity where the plaintiff failed to show that the defendants participated in the plaintiff's arrest).

In contrast, the factual allegations in the Complaint describe the direct and active involvement of Chief Manley and Officers Creaser and Baez in Plaintiff's arrest ("**Arresting Defendants**"). Nonetheless, Plaintiff still failed to state claims against the Arresting Defendants. An affirmative defense to a crime only negates probable cause for an arrest when the defense was "conclusively" established. *See Williams v. Sirmons*, 307 F. App'x 354, 358-59 (11th Cir. 2009). Further, the Fourth Amendment does not require police officers to consider the validity of a suspect's affirmative defense prior to making an arrest. *See Morris v. Town of Lexington*, 748 F.3d 1316, 1325 (11th Cir.

2014).[4] Rather, police officers are only prohibited from disregarding the information available to them—particularly plainly exculpatory evidence. *See Kingsland*, 382 F.3d at 1229. The crucial question is what each of the Arresting Defendants reasonably believed under the totality of the circumstances. *See Gevarzes v. City of Port Orange*, No. 6:12-cv-1126-ORL-37DAB, 2013 WL 610456, at *5 (M.D. Fla. Feb. 19, 2013).

Construed in the light most favorable to Plaintiff, the factual allegations of the Complaint are that the Arresting Officers arrived on the scene in response to Mrs. Davis' 911 call implicating Plaintiff in a shooting, and they found that: (1) Plaintiff appeared to have a bruised and swollen face and injuries to his knees, but Timmy had fatal gunshot wounds; (2) Plaintiff—who was laying on top of Timmy—admitted to shooting Timmy; (3) the weapon Plaintiff admittedly used to shoot Timmy was inside the front pocket of Plaintiff's pants; and (4) no persons visually witnessed Plaintiff's actual shooting of Timmy.[5] (*See* Doc. 122 ¶¶ 50, 51.) Reasonable officers presented with these circumstances would—at a minimum—have arguable probable cause to believe that Plaintiff had committed a crime.

Further, even if reasonable officers in the Arresting Officers' situation would find that Plaintiff's self-defense claim was plausible, the Arresting Officers were not required to delay arrest pending investigation of Plaintiff's defense. *See Rankin*, 133 F.3d at 1435–1436 (11th Cir. 1998); *see also Gevarzes*, 2013 WL 610456, at *5 ("The law does not

---

[4] *See Scarbrough v. Myles*, 245 F.3d 1299, 1302–03 (11th Cir. 2001); *see also Rankin*, 133 F.3d at 1436 ("An officer, need not take 'every conceivable step . . . at whatever cost, to eliminate the possibility of convicting an innocent person.'") (quoting *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989).

[5] While Mrs. Davis allegedly witnessed the altercation that occurred between Plaintiff and Timmy inside the Home, the only persons who witnessed the Shooting was Timmy and Plaintiff himself.

require officers to take the possibility of self-defense into account when they arrive on the scene of a domestic disturbance and it is undisputed that one party [shot] another."). In sum, the factual allegations of the Complaint present a sufficiently ambiguous situation that a reasonable officer could have concluded that at least arguable probable cause existed to arrest Plaintiff. Accordingly, Counts III through X are due be dismissed.[6] *See Morris*, 748 F.3d 1316, 1325 (11th Cir.2014) (finding officers had probable cause to arrest the plaintiff for assault even though the plaintiff later prevailed at his criminal trial by asserting state law affirmative defenses of self-defense).

### 2.    Unlawful Search

Aside from Officer Creaser, Plaintiff asserts § 1983 claims against all of the Individual Defendants for unlawful search of his Home. Again, Fourth Amendment secures an individual's right to be secure in his home and prohibits government officials from warrantless entry or search of a person's home absent certain narrow exceptions. *See United States v. Walker*, 390 F. App'x 854, 857 (11th Cir. 2010); *United States v. Ramirez–Chilel*, 289 F.3d 744, 751 (11th Cir. 2002) (explaining that a warrantless search of a person's home is presumptively unreasonable). The narrow exceptions include consent or exigent circumstances. *See United States v. Tobin*, 923 F.2d 1506, 1510

---

[6] In reaching its conclusion, the Court is not persuaded by Plaintiff's assertion that he was unlawfully seized because he was arrested for first degree murder prior to Timmy's death. (Doc. 122, pp. 10, 16.) It is well-established in the Eleventh Circuit that the "validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty.*, 956 F.2d 1112, 1119 n. 4 (11th Cir. 1992). If an officer has "arguable probable cause to arrest for any offense, qualified immunity will apply." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1257 (11th Cir. 2010). In this case, the Officers had arguable probable cause to arrest Plaintiff for a variety of crimes, including, aggravated assaulted. *See* Fla. Stat. § 784.021 (defining aggravated assault as an assault with a deadly weapon without intent to kill).

(11th Cir. 1991).

Plaintiff pled sufficient facts demonstrating that the Officers, with the exception of Officers Baez, entered and searched the Home without a warrant or consent. (*See* Doc. 122, pp. 77, 85, 51–65.) The Officers do not refute these facts; however, they argue that their search of the Home was justified by exigent circumstances that are apparent on the face of the Complaint. Specifically, the Officers maintain that they were attempting to prevent "the potential for loss or destruction of evidence." (Doc. 127, p. 16.) The Court is unpersuaded. Nowhere in the Complaint does Plaintiff aver that anyone was inside the Home immediately prior to the Officers' entry. Rather, a reader would plausibly infer that no one was present at the time the Officers decided to enter and search the Home. (*See id.* ¶¶ 64, 73.) Thus, a risk of loss or destruction of evidence is not apparent from the allegations of the Complaint, and the Court finds that Plaintiff has pled sufficient facts to state a § 1983 claim against Chief Manley and Officers Dunn, Fernandez, Torres, Parkinson, Reinhardt, for the alleged unlawful search of his residence. Contrarily, Plaintiff failed to plead facts demonstrating that Officers Baez is liable for this offense. As such, Plaintiff can proceed on Counts XI through XVI, but Count XVII is due to be dismissed for failure to state a claim.

## FEDERAL CLAIMS AGAINST THE CITY

Plaintiff brings § 1983 claims against the City for "false arrest" and "unreasonable search," asserting a failure to train or supervise the Officers. (Doc. 122, pp. 31–34.) However, Plaintiff's claims fail for multiple reasons. First and foremost, municipal liability under § 1983 must be predicated on an underlying constitutional or statutory violation. *See, e.g.*, *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986). The Eleventh Circuit has found

that when an officer had qualified immunity for § 1983 claims of false arrest, the plaintiff has no basis on which to establish municipal liability. *See Howell v. City of Lithonia*, 397 F. App'x 618, 621 (11th Cir.2010). Having concluded that the Officers are entitled to qualified immunity with respect to Plaintiff's claims for false arrest, his claim for false arrest against the City also fails.

Moreover, it is well-settled that a municipality cannot be liable under § 1983 for the acts of its employees based solely on the doctrine of *respondeat superior*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, a municipality bears liability under Section 1983 only if the challenged action implements or executes a municipal policy or custom. *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir.1997) (citing *Monell*, 436 U.S. at 694). That said, "municipal liability may be imposed for a single decision by a municipal policymaker under appropriate circumstances." *Scala*, 116 F.3d at 1399 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). "[L]iability may arise from 'a course of action tailored to a particular situation not intended to control decisions in later situations,' provided that 'the decision maker possesses final authority to establish municipal policy with respect to the action ordered." *Id.*

Here, the Complaint does not provide factual allegations of an actual custom, policy, or practice that caused a violation of Plaintiff's constitutional rights. Plaintiff fails to offer any facts demonstrating a widespread custom or practice, as he only describes alleged constitutional violations involving no one other than himself. Plaintiff's failure to allege a custom, policy or practice on the part of the APD, is fatal to his claim for municipal liability against the City. Accordingly, in keeping with the substantive requirements of *Monell*, Counts I and II are due to be dismissed. *See Harvey v. City of Stuart*, 296 F. App'x

824, 826 (11th Cir.2008) (affirming dismissal of § 1983 action against municipality because the plaintiff "failed to identify any policy or custom that caused a constitutional violation, and his vague and conclusory allegations were insufficient to support the complaint").

## STATE LAW CLAIMS AGAINST THE OFFICERS AND THE CITY

Plaintiff asserts state law claims against Defendants for false arrest, malicious prosecution, and IIED. (*See* Doc. 122, pp. 65–118.) For the reasons that follow, Plaintiff may only proceed with his IIED claims against the Officers. The remaining claims must be dismissed.

## I.    Malicious Prosecution and Unlawful Arrest

Under Florida law, an absence of probable cause is one of the elements of a malicious prosecution claim, *Alamo Rent–A–Car, Inc. v. Mancusi*, 632 So.2d 1352, 1355 (Fla.1994), and the existence of probable cause is an affirmative defense to a false arrest claim under Florida law, *Metropolitan Dade County v. Norton*, 543 So.2d 1301 (Fla. 1st DCA 1989). Having found that probable cause existed for Plaintiff's arrest, his state law claims for false arrest, Counts XVIII–XXV, and malicious prosecution, Counts XXVI–XXXIV, are due to be dismissed with prejudice.

## II.    Intentional Infliction of Emotional Distress

A claim for  intentional infliction of emotional distress has  four elements: (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct by the defendant; (3) the conduct caused the emotional distress; and (4) the emotional distress was severe. *Stewart v. Walker*, 5 So.3d 746, 749 (Fla. 4th DCA 2009). Liability will lie only where the defendant's conduct is "'so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277, 278–79 (Fla.1985) (quoting Restatement (Second) of Torts § 46 (1965)). Whether conduct rises to an outrageous and extreme level is a matter of law. *Gandy v. TransWorld Comput. Tech Grp.*, 787 So.2d 116, 119 (Fla. 2d DCA 2001).

Plaintiff claims that the Officers intended to, and did, cause him emotional distress when they "devised a plan of attack to manufacture probable cause in order to get [Plaintiff] arrested, prosecuted and convicted of murdering his son which they knew he did not do." (Doc. 129, p. 19.) In particular, Plaintiff points to incidents where the Officers allegedly failed conduct a meaningful investigation, manipulated evidence, and deliberately furnished false evidence and testimony. (Doc. 122, pp. 105–118.)

To the extent that Plaintiff's IIED claim is premised on Defendants alleged failure to conduct a meaningful investigation, or Defendants' alleged false arrest of Plaintiff and his Employee, Plaintiff's claim fails. Courts have frequently held that the failure to perform a meaningful investigation and simple allegations of false arrest, do not, as a matter of law, give rise to a claim for IIED. *See e.g. Drudge v. City of Kissimmee*, 581 F. Supp. 2d 1176 (M.D. Fla. 2008); *Frias v. Demings*, 823 F. Supp. 2d 1279, 1289 (M.D. Fla. 2011); *Artubel v. Colonial Bank Group*, 2009 WL 3411785 (M.D. Fla. Aug. 8, 2008). Furthermore, having already ruled in the Defendants favor as to the false arrest and malicious prosecution, the Court finds that conduct relating to Plaintiff's alleged false arrest and Defendants alleged failure to conduct a meaningful investigation is not outrageous or extreme enough to support a claim for IIED. Similarly, the Officers alleged deceit with respect to Timmy's medical condition (*see* Doc. 122 ¶¶ 108–130), did not rise to the level

of being extreme or outrageous in nature" and cannot support a claim for IIED. *See e.g.*

*Gonzales-Gonzalez-Jimenez de Ruiz v. United States*, 231 F. Supp. 2d 1187, 1199-1200

(M.D. Fla. 2002).

By contrast, an officer's fabrication of evidence in order to inculpate a criminal

suspect may constitute the extreme and outrageous behavior sufficient to support a claim

of IIED. *See Diaz–Martinez v. Miami–Dade Cnty.*, No. 07–20914–CIV, 2009 WL 2970468,

at *14 (S.D. Fla. Sept. 10, 2009) (finding that plaintiff had sufficiently alleged extreme and

outrageous conduct where defendants' improper conduct during photo array was alleged

to have led to the plaintiff's false imprisonment for over 20 years); *see also Spadaro v.*

*City of Miramar,* 855 F. Supp. 2d 1317, 1337 (S.D. Fla. 2012); *(*finding that the plaintiff

had adequately stated a claim for IIED, where he alleged that the defendants fabricated

evidence against a fifteen year old boy with mental deficiencies, and "conspired to convict

[him] of a crime they knew he did not commit").

Here, the Complaint is replete with factual allegations that the Officers omitted or

altered evidence, and provided false deposition and trial testimony, in an attempt to have

Plaintiff wrongfully prosecuted and convicted. (*See generally* Doc. 122.) Accepting these

allegations as true, the Court finds that Plaintiff has sufficiently alleged a claim for IIED

against the Officers, as the conduct alleged may constitute the extreme and outrageous

behavior. As such, Plaintiff may proceed with Counts XXXVI through XXXXIII. That leaves

Plaintiff's claim for IIED against the City.

A municipality is generally subject to *respondeat superior* liability under Florida law

for the torts of its agents, see section 768.28(5), Florida Statutes (2002). A municipality,

however, is "not [] liable in tort for the acts or omissions of an officer, employee, or agent

... committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property," id. § 768.28(9)(a). Here, Plaintiff's IIED claim against the City rests primarily on the alleged intentional and malicious misconduct of the Officers. (Doc. 122 ¶¶ 105–117.) Therefore, pursuant to § 768.28, the City cannot be held liable for Plaintiff's emotional distress. Accordingly, the City's motion to dismiss Plaintiff's claim for IIED is due to be granted.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1.   Defendant City of Apopka's Motion to Dismiss Plaintiff's Third Amended Complaint **(Doc. 128)** is **GRANTED**.

2.   Counts I, II, XVIII, XXVI, and XXXV are dismissed with prejudice for failure to state a claim.

3.   Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint and Supporting Memorandum of Law **(Doc. 127)** is **GRANTED IN PART** and **DENIED IN PART**.

4.   Counts III–X, XVII, XIX–XXV, XXVII–XXXIV are dismissed with prejudice for failure to state a claim.

5.   In all other respects, the Officers motion is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on July 1, 2016.



ROY B. DALTON JR.
United States District Judge

Copies furnished to:

Counsel of Record