UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TIMOTHY ALLEN DAVIS, SR.,

     Plaintiff,

v.                           Case No. 6:15-cv-1631-Orl-37LRH

CITY OF APOPKA,

     Defendant.

_____

## <u>ORDER</u>

Plaintiff Timothy Allen Davis, Sr.'s remaining claim concerns a chief evil: the unlawful search of his home in the aftermath of Mr. Davis fatally shooting his son.[1] The pressing question for the Court is whether Defendant City of Apopka ("**City**") can be liable for this chief evil based on its Chief of Police's involvement in the search. Both parties moved for summary judgment. (Doc. 203 ("**City Motion**"); Doc. 205 ("**Davis Motion**").) Each side responded and replied. (Docs. 212, 218, 224, 225.) On review, the Davis Motion is due to be granted and the City Motion denied.

## I.    BACKGROUND[2]

Around dusk on October 1, 2011, a domestic dispute culminated in Mr. Davis

---

[1] The U.S. Supreme Court stated, "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Payton v. New York*, 445 U.S. 573, 585–86 (1980) (quoting *United States v. U.S. Dist. Ct. E.D. Mich.*, 407 U.S. 297, 313 (1972)).

[2] For resolving a summary judgment motion, the Court ordinarily presents the facts in the light most favorable to the non-moving party. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). Here, however, both parties move for summary

shooting his son, who died as a result. (*See* Doc. 205-4, p. 3.) Apopka Police Department

("**APD**") officers, including Chief of Police Robert Manley, III,[3] were dispatched to the

scene. (Doc. 205-2, ¶ 4; Doc. 205-3; Doc. 205-11, p. 9:6–16.[4]) Officers Rafael Baez and Mark

Creaser were first to respond, arriving minutes after the shooting, around 6:24 p.m. (Doc.

205-3; Doc. 205-4, pp. 3, 5; Doc. 206-5, p. 28:10–12.) Officer Baez noticed Mr. Davis's son

bleeding from the chest and Mr. Davis on top of him trying to talk to him. (Doc. 205-4, p.

3.) Several neighbors gathered nearby. (*Id.* at 3, 5.) Officer Creaser immediately detained

Mr. Davis and retrieved a handgun from his front pocket. (*Id.*)

Chief Manley arrived around 6:30 p.m., at which point paramedics had arrived

and were tending to Mr. Davis's son. (Doc. 205-3, p. 4; Doc. 205-11, pp. 10:19–11:12, 13:9–

12.) Mr. Davis was in handcuffs, complaining of knee pain, so Chief Manley instructed

the officers to take Mr. Davis into the garage and allow him to sit down. (Doc. 205-2, ¶ 5;

Doc. 205-7, pp. 18:23–19:5; Doc. 205-8, p. 26:2–9; Doc. 205-11, p. 14:1–15; Doc. 206-5, pp.

29:3–10, 20–24.) Mr. Davis refused to sit and continued to complain of pain, so Chief

Manley called another ambulance to attend to Mr. Davis's injuries. (Doc. 205-7, p. 19:7–

16; Doc. 205-11, p. 14:17–22; Doc. 206-5, pp. 29:20–30:6.) Mr. Davis went to a local hospital

while his son, daughter, and wife went to a different hospital—no family members

---

judgment, and the material underlying facts are not in dispute—rather, it is the inferences drawn from those facts that the parties dispute. So in this Part, the Court presents the undisputed facts from the record evidence.

[3] The Chief of Police is the highest-ranking law enforcement officer and sets the policy and procedures for law enforcement officers to follow. (Doc. 205-11, p. 5:5–10.)

[4] The page numbers for citations to the depositions cited are those from the top right-hand corner of the deposition transcripts rather than those associated with the document number at the top of the page.

remained on scene.[5] (Doc. 205-2, ¶¶ 6–7; Doc. 205-4, pp. 3, 5; Doc. 205-8, p. 33:16–18.)

Chief Manley called Deputy Chief Donald Heston to the scene and told him to make sure

APD does its best work. (Doc. 205-10, pp. 4:2–15, 5:25–15, 8:13–23; Doc. 205-11, pp. 25:5–

14, 46:20–47:2, 52:2–9.) This all happened within 15 to 30 minutes of officers arriving on

scene. (Doc. 205-8, p. 26:19–20; Doc. 206-5, p. 33:3–7.) Chief Manley left shortly after Mr.

Davis and his family,[6] leaving Deputy Chief Heston as the highest-ranking officer on

scene. (Doc. 205-8, p. 33:13–15; Doc. 205-11, pp. 16:20–22; 17:21–25, 25:5–8, 46:20–47:2,

52:2–9.)

At issue is what followed during the Davis family's absence. Here's the story as

told by those on scene: Detective Ruben Torres, the lead detective in charge of the

investigation, arrived and remained throughout the night, departing only to take written

statements from witnesses and canvass the neighborhood. (Doc. 205-4; Doc. 205-5, pp.

16:25–17:1; Doc. 205-6, pp. 60:11–22, 64:18–21; Doc. 214-11, p. 5:2–12, 22–24.) Detective

Matthew Reinhardt arrived around 7:15 p.m., noticed officers in front of the garage,

spoke to Detective Torres, read the witness statements, and left shortly after to prepare a

---

[5] According to Mr. Davis, Chief Manley asked whether the video surveillance cameras on his garage worked before Mr. Davis left for the hospital, but Chief Manley says this conversation never happened—he says he never even saw the cameras. (Doc. 205-8, p. 47:15–17; Doc. 205-11, p. 22:20–22; Doc. 206-5, p. 30:5–24; Doc. 205-7, p. 21:13–17.) Rather, Chief Manley says the only thing he did between Mr. Davis leaving and his own departure is instruct Sergeant Kim Walsh to take Mrs. Davis to the hospital. (Doc. 205-7, p. 21:18–21; Doc. 205-11, p. 17:21–25.) Chief Manley also says the only time he was at or near the garage was when he called the ambulance for Mr. Davis, and he says he didn't go into the garage. (Doc. 205-11, p. 17:3–7.)

[6] According to the CAD Notes stating when officers arrived and left, Chief Manley was on scene until 8:02 p.m. (Doc. 205-3, p. 4), but he says that isn't correct because he left by 7:00 p.m. (Doc. 205-11, p. 18:1–17).

search warrant and affidavit for permission to search the home. (Doc. 205-5, pp. 15:22–24, 16:2–17:6, 18:2–7.) Captain Jerome Miller and Lieutenant David Call also arrived around this time. (Doc. 206-3, pp. 4:14–6:19, 9:15–11:22; Doc. 214-4, p. 4:22–24.)

While Detective Reinhardt was away working on the search warrant, on-call Crime Scene Technician ("**CST**") Nichole Dunn arrived around 7:21 p.m. and noticed other APD officers in the driveway and garage—the garage door was open. (Doc. 205-2, ¶ 9; Doc. 205-3, p. 4; Doc. 205-5, pp. 28:20–29:5; Doc. 206-4, pp. 5:23–6:2.) According to CST Dunn, a group of detectives formulated the plan for processing the scene and investigating. (Doc. 206-4, pp. 27:18–28:1; Doc. 214-1, p. 31:6–12.) During this meeting, a higher ranking official ordered her to enter Mr. Davis's garage to take photographs and process the area of the altercation between Mr. Davis and his son, but she doesn't recall who.[7] (Doc. 205-2, ¶ 27; Doc. 205–5, p. 33:2–7; Doc. 206-4, p. 27:18–24.) Her photos reveal she complied, taking pictures inside Mr. Davis's garage as early as 7:45 p.m. (Doc. 205-2, ¶¶ 11–12; Doc. 205-5, pp. 29:6–22, 30:22–31:15; Docs. 205-13–205-15; Doc. 206-4, p. 11:11–13.) After taking pictures, she searched for evidence in the garage, put down markers for processing, and took more photographs. (Doc. 205-5, pp. 31:20–23, 32:2–18, 37:2–38:7; Docs. 205-14–205-16; Doc. 206-4, pp. 13:1–13, 24:11–15.) After this, a higher ranking official instructed CST Dunn to go inside the house to photograph, which she says she

---

[7] CST Dunn remembers speaking to Detective Reinhardt, Detective Torres, Lieutenant Call, and her supervisor, Lieutenant Fernandez, that evening. (Doc. 214-1, p. 7:14–23.) She doesn't mention speaking to Chief Manley. (*Id.*) Chief Manley doesn't recall seeing CST Dunn that evening; if he did, he claims it was when he came back later in the night. (Doc. 205-11, p. 20:3–5.)

did alone around 9:00 p.m. (Doc. 205-2, ¶¶ 11–12; Doc. 205-5, pp. 38:8–10, 40:19–41:13; Doc. 205-16; Doc. 206-4, pp. 24:16–21, 26:19–28:15.)

CST Dunn wasn't the only person to enter Mr. Davis's garage and house. While CST Dunn was processing the scene, APD officers—including some of the highest-ranking ones—went into the garage, house, or both. (Doc. 205-3; Doc. 205-4, p. 14; Doc. 205-18.) CST Dunn says other officers searched with her for evidence in the garage, including shell casings, bullets, and blood droplets. (Doc. 205-5, pp. 33:17–19, 34:18–25, 35:22–24.) And both Deputy Chief Heston and Captain Miller admit to going into the house and the garage. (Doc. 205-10, pp. 9:8–11; Doc. 206-3, pp. 11:5–22, 13:1–13.) Deputy Chief Heston recalls going into the house to look at a door jam and going into the garage to see what evidence was there; Captain Miller recalls going into the garage and upstairs. (Doc. 205-10, pp. 10:15–19, 13:10–21; Doc. 206-3, pp. 11:9–22, 13:1–18.)

Chief Manley returned to the scene around 9:00 p.m. for an update and to see if anyone needed anything. (Doc. 205-11, pp. 18:18–23, 21:23–24.) During this trip to the scene, he talked to Captain Fernandez, Captain Miller, Lieutenant Call, and Deputy Chief Heston. (Doc. 205-7, pp. 22:25–23:5.) Despite this, he says he never asked whether there was a warrant and didn't know whether one had been obtained. (Doc. 205-11, pp. 19:9–11, 40:11–16.) He also claims he never went into the garage or house or saw other officers enter. (Doc. 205-11, pp. 17:3–9, 19:4.) Chief Manley says he was only there for around 20 minutes. (Doc. 205-7, pp. 22:25–23:5; Doc. 205-11, p. 33:12–14.) And he insists he never instructed any officer or CST to search Mr. Davis's home before the execution of the search warrant. (Doc. 205-11, pp. 52:21–53:2.)

All this happened before 9:45 p.m., when Detective Reinhardt arrived at Judge Alice Blackwell's residence with the search warrant and affidavit. (Doc. 205-2, ¶¶ 18–19; Doc. 205-4, p. 6; Doc. 205-5, p. 10:10–21; Doc. 206-7.) After briefly reviewing the affidavit, Judge Blackwell signed the search warrant a little before 10 p.m., at which point Detective Reinhardt called Lieutenant Call to alert him. (Doc. 205-2, ¶¶ 20–21; Doc. 205-5, pp. 12:17–20, 19:22–25; Doc. 206-6, pp. 1–2.) Detective Reinhardt returned to the scene with the warrant around 10:45 p.m. (Doc. 205-5, p. 13:14–17.) CST Dunn, Lieutenant Call, and Detective Torres then walked through Mr. Davis's home, and CST Dunn took more photographs of evidence found during this search. (Doc. 205-5, pp. 21:6–12, 42:6–11, 48:20–22; Doc. 205-6, pp. 76:21–77:3; Doc. 206-4, p. 24:21–25; Doc. 214-11, pp. 10:9–13:24.)

But those involved aren't the only storytellers from that night: Mr. Davis's surveillance cameras draw portions of Chief Manley's version into question. From one angle, showing the driveway from near the front of the garage down to the street, Chief Manley arrives shortly after the shooting and is later seen with Mr. Davis and other officers moving out of view as they head toward the garage. (Doc. 205-17, 18:24–35 (Cam. 4).[8]) Chief Manley reappears on camera from that direction as Mr. Davis leaves, and he chats awhile with Mr. Davis's wife and other officers. (*Id.* at 18:39–55 (Cam. 4).) Chief

---

[8] Mr. Davis provided Exhibit 11, filed at Doc. 205-17, to the Court on multiple thumb drives containing hours of surveillance footage of Mr. Davis's house from multiple camera angles. For clarity and consistency, the Court cites this evidence by the hour and minute time stamps on the video and includes a parenthetical identifying the camera angle showing the events described. "Cam. 2" refers to the camera facing the front door of Mr. Davis's house, and "Cam. 4" refers to the camera facing the driveway, which shows the area in front of the garage but doesn't show the garage.

Manley walks out of the camera's view around 6:55 pm. (*Id.* at 18:55 (Cam. 4).) In his absence, other officers and CST Dunn appear; some talk near the street before dispersing. (*Id.* at 18:56–19:30 (Cam. 4).) CST Dunn periodically heads toward the garage and leaves the camera's view before returning to view, rinse and repeat and sometimes carrying something. (*Id.* at 19:31–20:57 (Cam. 4).) Other officers do the same—all possibly entering and leaving the garage. (*Id.* (Cam. 4).) From another camera angle, showing Mr. Davis's front doors and a glimpse inside his foyer through them, an officer walks into Mr. Davis's front door briefly before exiting. (*Id.* at 19:17–18 (Cam. 2).) CST Dunn and unidentifiable silhouettes of other officers later walk by inside the house. (*Id.* at 19:31–20:57 (Cam. 2).) Camera flashes and flashlights sporadically illuminate the frame. (*Id.* (Cam. 2).)

Back to the driveway angle, Chief Manley briefly appears from the direction of the garage following behind Deputy Chief Heston at 9:02 p.m.—his exact time and place of arrival on scene weren't captured.[9] (*Id.* at 21:02 (Cam. 4).) Around this time, other officers and CST Dunn come and go in the driveway toward and away from the garage as before. (*Id.* at 21:02–22:00 (Cam. 4).) From the front door angle, officers continue to occasionally walk by the front door from inside the house. (*Id.* at 21:02–39 (Cam. 2).) In the final relevant scene, officers gather to talk in the driveway and street until the search warrant is signed—Chief Manley may be amongst them, at least for some time. (*Id.* at 21:02–22:00 (Cam. 4).) But the darkness and poor video quality obscure most of Chief Manley's return

---

[9] About this video, Chief Manley says he is not coming from the garage; he is coming from the street. (Doc. 205-11, p. 35:4–22.) Deputy Chief Heston also says the video merely shows him and Chief Manley by the garage. (Doc. 205-10, p. 23:17–20.)

visit and ultimate departure.[10] (*Id.* (Cam. 4).)

Based in part on what the surveillance footage showed of that night, Mr. Davis sued the City, Chief Manley, officers, detectives, and the CST involved for various claims under state law and 42 U.S.C. § 1983, including false arrest and unreasonable search and seizure. (*See* Docs. 1, 122.) After multiple rounds of pleading, settlement with the individuals, and an appeal, all that remains is Mr. Davis's unlawful search claim against the City under § 1983. (*see* Docs. 1, 3, 38, 114, 122, 133, 162, 164, 171, 172, 193); *see also Davis v. City of Apopka*, 734 F. App'x 616 (11th Cir. 2018).

Mr. Davis and the City both move for summary judgment, mainly contesting whether the City can be liable for the unlawful search of the home. (*See* Docs. 203, 205.) With briefing complete (*see* Docs. 212, 218, 224, 225), the matter is ripe.

## II.    LEGAL STANDARDS

Summary judgment is appropriate only if the movant shows there is "no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On issues for which the movant has the burden at trial, it must show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on the essential elements. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citing *United States v. Four Parcels of Real Prop. in Green*

---

[10] Mr. Davis has a more conclusive view of this footage: Chief Manley, along with other officers, entering his home before the search warrant. (Doc. 205-8, pp. 30:2–7, 37:18–38:23; Doc. 205-9, pp. 94:11–95:17.) He says Chief Manley "[m]ost definitely" entered his home before the signed search warrant. (Doc. 205-8, pp. 33:19–34:5.)

*& Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991)).

On issues for which the nonmovant would bear the burden of proof, the movant has two options: (1) it may simply point out a lack of evidence to support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Four Parcels*, 941 F.2d at 1438 (citing *Celotex Corp.*, 477 U.S. at 331). "The burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant, *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006), so that "when conflicts arise between the facts evidenced by the parties, [the court] credit[s] the nonmoving party's *version*." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). Yet "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592–94 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for

purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.   ANALYSIS

Mr. Davis contends the APD's search of his home was undeniably unlawful while contending Chief Manley's involvement remains disputed. (Docs. 205, 212, 224.) The City, without addressing the illegality of the search, moves for summary judgment on the City's lack of liability, highlighting the absence of evidence that Chief Manley ordered the search, which it argues is necessary for municipal liability. (Docs. 203, 218, 225.) Let's start with the search's constitutionality and then look at the City's potential liability.

### A.     The Davis Motion: The Search's Constitutionality

The Davis Motion poses one narrow question: was the search of the home before the issuance of a search warrant unconstitutional? (*See* Doc. 205.) Mr. Davis says yes because APD detectives and the CST entered and searched his garage and home with no exigent circumstances. (*Id.* at 9–11.) The City avoids the question, pointing to other reasons to deny the Davis Motion, including procedural impropriety, inefficiency, and lack of constitutional harm. (*See* Doc. 218.)

The Fourth Amendment provides that "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Because "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," it is "a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585–86 (1980) (quotation

marks and citation omitted). But "a few specifically established and well-delineated exceptions" exist, including consent and exigent circumstances.[11] *See Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Tobin*, 923 F.2d 1506, 1509–10 (11th Cir. 1991). At bottom, "warrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) (citations omitted).

The answer to the constitutionality question is yes: the search here was unlawful. It's undisputed that APD officers and the CST entered and searched Mr. Davis's garage and home before the search warrant issued. CST Dunn admitted to entering the garage to photograph and search for evidence and to entering the home to photograph before the search warrant. (Doc. 205-2, ¶¶ 11–12; Doc. 205-5, pp. 29:6–32:18, 37:2–41:13; Docs. 205-13–205-16; Doc. 206-4, pp. 11:11–13:13, 24:11–28:15.) She also admitted that other officers helped her search the garage before the warrant. (Doc. 205-5, pp. 33:17–35:24.) Likewise, Deputy Chief Heston and Captain Miller admitted to going into the house and garage. (Doc. 205-10, pp. 9:8–10:19, 13:10–21; Doc. 206-3, pp. 11:5–22, 13:1–13.) The surveillance footage corroborates and adds to this testimony: an officer walks into the front door of Mr. Davis's home; officers and CST Dunn come and go from the direction

---

[11] Several exigencies justifying a warrantless search are: (1) the "emergency aid" exception, when "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury"; (2) "when [police] are in hot pursuit of a fleeing suspect"; and (3) when there is a need "to prevent the imminent destruction of evidence." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (quotation marks and citations omitted).

of the garage, at times carrying what appears to be evidence; and officers and CST Dunn appear inside the home with flashlights—all before Judge Blackwell signed the search warrant. (Doc. 205-17, 19:17–22:00 (Cams. 2, 4).) On this record, the search before the warrant was unreasonable unless there was consent or exigent justification. *See Payton*, 445 U.S. at 585–86 (noting warrantless searches of homes are presumptively unreasonable absent narrow exceptions); *Mincey*, 437 U.S. at 393–94 (noting a warrant is required unless exigencies make the warrantless search objectively reasonable).

But the City offers no justification for the warrantless entry and search of Mr. Davis's home. (*See* Doc. 218.) This was the City's burden to bear, and it made no effort to shoulder it.[12] *See United States v. Santa*, 236 F.3d 662, 669 (11th Cir. 2000) (citing *Chimel v. California*, 395 U.S. 752, 762 (1969)). Chief Manley acknowledged that neither CST Dunn nor any APD personnel should have been in the home without an executed search warrant. (Doc. 205-11, pp. 7:1–4, 19:12–18, 23:5–25.) And the Court can't conceive of any exigency under the circumstances here. *Cf. Kentucky*, 563 U.S. at 460 (describing exigencies allowing a warrantless search). So the warrantless search of Mr. Davis's home was unreasonable and thus unconstitutional. *See Payton*, 445 U.S. at 590 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent

---

[12] The City's only mention of exigent circumstances is in its affirmative defenses in response to the complaint (not in response to the Davis Motion), where it asserted—without any evidence or factual support—that the conduct was "reasonable and necessary" given the "exigent circumstances and danger created by Plaintiff's conduct." (Doc. 195, p. 13.) This conclusory statement is not enough to establish the existence of any exigencies justifying the warrantless search, particularly considering Mr. Davis was detained and no longer on scene.

circumstances, the threshold may not reasonably be crossed without a warrant.").

Beyond this, none of the City's affirmative defenses alter this result. (*See* Doc. 205, pp. 10–11; *see also* Doc. 195, pp. 11–13 (affirmative defenses).) The City contends "probable cause existed for the search." (Doc. 195, p. 11.) But probable cause, absent exigent circumstances, is not enough to justify the warrantless search of Mr. Davis's home. *See Santa*, 236 F.3d at 668 ("A warrantless search is allowed, however, where *both* probable cause and exigent circumstances exist." (emphasis added) (quoting *Tobin*, 923 F.2d at 1510)). The City asserts the conduct was in "good faith" and "objectively reasonable under the circumstances present." (Doc. 195, p. 12.) Good faith, however, is not a defense. *See Wheeler v. City of Pleasant Grove*, 896 F.2d 1347, 1349 (11th Cir. 1990) ("[M]unicipalities cannot claim good faith . . . as a defense in section 1983 actions" (citing *Owen v. City of Independence*, 445 U.S. 622 (1980))). And, as discussed, the City didn't establish any evidence to render the warrantless search objectively reasonable. *See Kentucky*, 563 U.S. at 460; *Santa*, 236 F.3d at 669.

The City, sidestepping the constitutionality issue, counters that the Court should deny the Davis Motion as procedurally improper and inefficient because he seeks only "a partial adjudication of an element of his constitutional claim against the City"—the constitutionality of the search. (*See* Doc. 218, pp. 1–5.) Federal Rule of Civil Procedure 56 undermines the City's contention. "A party may move for summary judgment, identifying each claim or defense—or the *part of each claim* or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added). The Advisory Committee Notes on Rule 56 elaborate, noting that it encompasses "disposition of less

than the whole action, whether or not the order grants all the relief requested by the motion." Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment. Given the express language of Rule 56 and the City's failure to cite any binding law to the contrary,[13] there is nothing improper or inefficient about the Davis Motion.[14]

In a last-ditch effort to defeat the Davis Motion, the City argues the Court should deny it because Mr. Davis has suffered no constitutional harm—"No harm, no foul," it proffers as the proper governing rule. (Doc. 218, pp. 6–7.) This argument twice fails. First, the City contends there is good reason to apply the inevitable discovery or independent source doctrine to preclude § 1983 liability, especially here where there was probable cause to search Mr. Davis's home, the warrant was being secured, and Mr. Davis cannot point to any damage he suffered. (*Id.* at 7.) But the Eleventh Circuit already rejected this argument earlier, relying on *Chatman v. Slagle*, 107 F.3d 380, 382–83 (6th Cir. 1997), for the

---

[13] The City relies primarily on cases from the District Court of Colorado to argue that "[m]any cases since the 2010 amendment maintain the rule that a motion for partial summary judgment on a mere element of a claim is not an appropriate use of the summary judgment procedure." (*See* Doc. 218, pp. 3–5.) But other judges in that court have found that "the Federal Rules and comments on the 2010 amendment are clear that the summary judgment mechanism is available to resolve *parts* of claims and defenses." *Aubrey v. Koppes*, 383 F. Supp. 3d 1203, 1213 (D. Colo. 2019) (citing Fed. R. Civ. P. 56(a)).

[14] This is particularly true because § 1983 claims require a plaintiff to "make a prima facie showing of two elements: (1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law." *Dollar v. Haralson Cty., Ga.*, 704 F.2d 1540, 1542–43 (11th Cir. 1983) (citations omitted); *see also Kimbrough v. City of Cocoa*, No. 6:05-cv-471-Orl-31KRS, 2006 WL 3335066, at *3 (M.D. Fla. Nov. 16, 2006) ("In order to establish municipal liability under § 1983, Plaintiffs must first establish that one or more of [their] constitutional rights were violated." (citing *McDonnell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 1987))). The constitutionality of the search goes to the first element.

proposition that "the reasoning which supports the use of the Fourth Amendment exclusionary rule and the related inevitable discovery doctrine in criminal cases does not apply in civil rights actions." *See Davis*, 734 F. App'x at 620 n.4 (quoting *Chatman*, 107 F.3d at 382–83). Second, the Davis Motion concerns the constitutionality of the search, not the harm (if any) Mr. Davis suffered. (*See* Doc. 205.) Whether Mr. Davis can ultimately prove damages resulting from the unlawful search is for another day. As the search was unconstitutional, the Davis Motion is granted. But the case against the City doesn't end there.

### B.     The City Motion: The City's Liability

The City Motion poses an altogether different question: even if the search of Mr. Davis's home was unconstitutional, can the City be held liable for it under § 1983? (*See* Doc. 203.) The City says no because Mr. Davis failed to provide evidence that Chief Manley ordered the search and, even if he had, Mr. Davis alleged Chief Manley was acting out of a personal vendetta against Mr. Davis. (*Id.* at 6–12.) Mr. Davis says the Court can't answer the question yet, as a genuine dispute remains over Chief Manley's direction of, participation in, and knowledge of the unlawful search, despite Chief Manley's motives. (*See* Doc. 212.)

Municipalities may be liable under § 1983 if they caused a constitutional violation through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). The same is true "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval

through the body's official decisionmaking channels." *Id.* at 690–91. A "custom is a practice that is so settled and permanent that it takes on the force of law," while a "policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (citations omitted). "Only those officials who have final policymaking authority may render the municipality liable under § 1983." *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). "[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur*, 475 U.S. at 480. "A municipality, however, cannot incur liability in a section 1983 action on a *respondeat superior* theory merely because it employs a tortfeasor." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 997 (11th Cir. 1990) (citing *Monell*, 436 U.S. at 691).

Four guiding principles exist for determining when a single act is enough to establish unconstitutional municipal policy. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). First, "municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, 'that is, acts which the municipality has officially sanctioned or ordered.'" *Id.* (quoting *Pembaur*, 475 U.S. at 480). Second, municipalities may be subject to § 1983 liability only by the acts of "those municipal officials who have 'final policymaking authority.'" *Id.* (quoting *Pembaur*, 475 U.S. at 483). Third, state law determines whether an official has final policy making authority. *Id.* (citing *Pembaur*, 475 U.S. at 483). Fourth, "the challenged action must have been taken

pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business." *Id.* (citing *Pembaur*, 475 U.S. at 482–83).

As the Eleventh Circuit has determined Chief Manley is a final policymaker for law enforcement matters, *see Davis*, 734 F. App'x at 619–20, the Court turns to whether Chief Manley "officially sanctioned or ordered" the search. *See Praprotnik*, 485 U.S. at 123 (quoting *Pembaur*, 475 U.S. at 480). "[A]n action that 'the municipality has officially . . . ordered' can give rise to liability under section 1983." *Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015) (quoting *Pembaur*, 475 U.S. at 480); *see also Pembaur*, 475 U.S. at 481 ("[W]here [the] action is directed by those who establish government policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."). The same is true for the unconstitutional acts performed by final policymakers. *See Board of Cty. Comm'rs of Bryan Cty. Okl. v. Brown*, 520 U.S. 397, 405 (1997) ("[P]roof that a[n] . . . authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily established that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains."); *see also Mandel v. Doe*, 888 F.2d 783, 793–95 (11th Cir. 1989) (deliberate indifference of final policymaker was attributable to the county). Further, "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Praprotnik*, 485 U.S. at 127. So § 1983 liability may arise "where—and only where—a

deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to subject matter in question." *Id.* at 483 (citation omitted).

On this record, viewed in the light most favorable to Mr. Davis,[15] a genuine dispute of material fact exists on Chief Manley's direction of, participation in, and knowledge of the unlawful search so the Court cannot answer the City Motion's liability question—a jury must decide. The evidence shows Chief Manley was present at Mr. Davis's house twice that night. During his first visit shortly after the shooting, Chief Manley directed officers on what to do with Mr. Davis, called Deputy Chief Heston to the scene, and talked to multiple other officers, although the specifics of these conversations remain unclear. (Doc. 205-2, ¶ 5; Doc. 205-7, pp. 18:23–19:5; Doc. 205-8, p. 26:2–9; Doc. 205-10, pp. 4:2–5:15, 8:13–23; Doc. 205-11, pp. 14:1–15, 25:5–14, 46:20–52:9; Doc. 206-5, p. 29:3–24; Doc. 205-17, 18:26–19:00 (Cam. 4).) During his second visit later that evening but before the search warrant, Chief Manley again talked to multiple officers, walked very close to the garage and potentially exited it, and was possibly on scene while other officers were in the garage or house conducting the illegal search. (Doc. 205-7, pp. 22:25–23:5; Doc. 205-11, pp. 18:18–23. 21:23–24; Doc. 205-17, 21:00–21:59 (Cams. 2, 4).) The conflicting evidence, particularly the video surveillance evidence, raises questions the Court can't sort out. For example, was Chief Manley involved in the

---

[15] Because only the City moved for summary judgment on the City's potential liability for the search based on Chief Manley's conduct, the Court views the relevant facts in the light most favorable to Mr. Davis. *See Battle*, 468 F.3d at 759.

decisionmaking surrounding the search? Did Chief Manley enter the garage (and the house) and participate in the warrantless search? Was Chief Manley aware of or a witness to the warrantless search, and did he approve of it? With these unresolved questions, the Court cannot absolve the City at this stage.

Ultimately, the City has failed to meet its burden of showing that no genuine dispute of material fact exists surrounding the City's potential liability. Whether Chief Manley directed or participated in the unlawful search, or adopted or ratified the unconstitutional act by knowing the unlawful search was occurring while he was on scene and approving of it remains unresolved. *See, e.g.*, *Pembaur*, 475 U.S. at 480–81 (discussing municipal liability where a final policymaker orders or directs the unconstitutional action); *Brown*, 520 U.S. at 405 (discussing municipal liability where the final policymaker's action or direction deprives the plaintiff of a constitutional right); *Praprotnik*, 485 U.S. at 127 (discussing municipal liability where a final policymaker approves of a subordinate's decision and the basis for it); *Matthews v. Columbia Cty.*, 294 F.3d 1294, 1297 (11th Cir. 2002) (discussing municipal liability "on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority"). In other words, a reasonable jury could find the City liable because deliberate actions attributable to the City through Chief Manley's decisions and conduct caused the violation of Mr. Davis's constitutional rights. *Cf. Brown*, 520 U.S. at 415 ("Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights."); *Pembaur*, 475 U.S. at 483

(finding municipal liability arises from "a deliberate choice" made by "officials responsible for establishing final policy").

The City also insists it cannot be held liable for the unlawful search notwithstanding Chief Manley's involvement because Mr. Davis alleged Chief Manley acted out of personal animus. (*See* Doc. 203, pp. 10–12.) This doesn't dispose of the need for a jury's further inquiry. The actions and decisions attributable to the City are at issue here, not the underlying motives. The Supreme Court has stated: "[A] final decisionmakers' adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, in some circumstances, give rise to municipal liability under § 1983." *Brown*, 520 U.S. at 406 (quoting *Pembaur*, 475 U.S. at 481); *see also Cooper v. Dillon*, 403 F.3d 1208, 1222–23 (11th Cir. 2005) (finding municipal liability for a one-time violation of federal rights based on the actions and deliberate decisions of an individual "clothed with final policymaking authority for law enforcement matters"). So, Chief Manley's motives aside, the City may still be liable for the unlawful search.[16] As a genuine dispute of material fact exists over the City's liability based on Chief Manley's actions and decisions, the City Motion is denied.

### IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

---

[16] This is consistent with the Eleventh Circuit's ruling at the motion to dismiss stage. The City raised Mr. Davis's personal animus allegations as grounds to dismiss the claim, arguing these feelings of animosity couldn't form the basis of a § 1983 claim against the City. (Doc. 214-7, pp. 27–30.) Despite this, the Eleventh Circuit found Mr. Davis stated a plausible unlawful search claim against the City. *Davis*, 734 F. App'x at 620.

1.   Plaintiff Timothy Allen Davis, Sr.'s Motion, and Memorandum in Support of His Motion, for Partial Summary Judgment (Doc. 205) is **GRANTED.**

2.   Defendant City of Apopka's Motion for Summary Judgment (Doc. 203) is **DENIED.**

3.   This case will proceed to trial on whether Defendant City of Apopka is liable under 42 U.S.C. § 1983 for the unconstitutional search of Plaintiff Timothy Allen Davis, Sr.'s home based on Chief of Police Robert Manley, III's actions and decisions.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on December 5, 2019.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record